[No. 15559. Department Two. March 22, 1920.]

H. F. PROCTOR, *Respondent*, v. STEPHEN APPLEBY *et al.,*
*Appellants.*[1]

APPEAL (93) — CESSATION OF CONTROVERSY — COMPLIANCE WITH JUDGMENT. On appeal from a judgment for the return of shares of stock in court, or for their value, there is no cessation of the controversy by delivery of the stock to plaintiff's attorney by the clerk of the court upon defendant's attorney's advice to the clerk that it was his duty to do so, where there was no voluntary delivery, and defendant's attorney stated he intended to appeal without giving a supersedeas bond.

EVIDENCE (37) — FACTS IN ISSUE OR RELEVANT — COLLATERAL ISSUES. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at any army post, evidence of plaintiff's purchase of an interest in other contracts indicating his confidence in defendants should be excluded as introducing a collateral issue, the contract not proving that defendants' conduct was such as to inspire the confidence of a reasonably prudent man.

SAME (65) — MATERIALITY — TENDENCY TO MISLEAD. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, evidence concerning a tentative plan for financing a concession should be excluded as outside the issues and tending to confuse the jury.

[1] Reported in 188 Pac. 481.

TRIAL (18) — INTRODUCTION OF DOCUMENTARY EVIDENCE. Where only parts of the minutes of meetings of a corporation are relevant, it is unnecessary to encumber the record with the minutes as a mass, most of which was foreign to the issues.

EVIDENCE (101)—DECLARATIONS AGAINST INTEREST. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, the record of the minutes instructing the secretary to prepare an interview for the newspapers is not an admission or declaration against interest on the part of appellant, to whom it was directed.

SAME (37)—RELEVANCY OF COLLATERAL FACTS. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, evidence as to the amount of time and money plaintiff had devoted to the affairs of the corporation as compared with other owners of stock should be excluded as irrelevant.

SAME (99, 104)—SELF-SERVING DECLARATIONS—HEARSAY. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, evidence of defendant's attempt to interview the commanding general, and of conversations with his aids, should be excluded, either as hearsay or irrelevant, and as introducing self-serving declarations.

SAME (101)—DECLARATIONS AGAINST INTEREST. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, evidence of a newspaper interview, as to which defendants had no part and were not consulted, is inadmissible as a declaration against interest on their part.

SAME (87)—ADMISSIONS—ACQUIESCENCE OR SILENCE—WHEN NOT AN ADMISSION. Upon an issue as to a conspiracy to fraudulently deprive plaintiff of his stock in a corporation having a concession at an army post, the silence of the defendants, as members of a committee, upon its being stated that no member of the committee would have an interest in the proposed concessions, is not competent evidence of a disclaimer of interest on their part, as there is no estoppel by silence unless there is a legal duty to speak.

SAME (68)—BEST AND SECONDARY EVIDENCE—FACTS DESCRIBED IN OR EVIDENCED BY WRITINGS. Title to real property, which is only collaterally involved, may be established by parol evidence from one qualified to speak.

SAME (65)—RELEVANCY.—TENDING TO MISLEAD. Upon an issue as to a conspiracy to deprive plaintiff of his stock in a corporation hav-

ing an amusement concession at an army post, evidence as to the amount of work done by defendant as an officer of the corporation is immaterial and objectionable as permitting a misleading comparison.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered February 13, 1919, upon the verdict of a jury rendered in favor of the plaintiff, in an action for the recovery of stock or its value, tried to the court. Reversed.

*Hayden, Langhorne & Metzger* and *John A. Shackleford,* for appellants.

*John B. Hart* and *Bates & Peterson,* for respondent.

FULLERTON, J.—In this action the respondent sought to recover from the appellants some four hundred shares of the capital stock of a corporation known as The Camp Lewis Amusement Company; or, in the case return of the stock could not be had, the value thereof. As the assignments of error are based to a large extent on the admission of evidence, a somewhat minute statement of the issues is necessary.

In his complaint, the appellant alleged that the corporation named was organized for the purpose of developing a part and portion of the army cantonment known as Camp Lewis, which was set aside by the duly constituted authorities as Greene Park, and that for that purpose the corporation had become and was the owner of a certain license, franchise, and privilege, granted by the commanding officer of the cantonment on October 22, 1917; that the capital stock of the corporation was one thousand shares, of the par value of one hundred dollars each; that, on the organization of the corporation, the respondent became and was the owner of six hundred shares of such stock, and that the defendants Neely and Smyly each became and was

the owner and holder of two hundred shares of such capital stock; that the license, franchise and privilege held by the corporation was secured for the corporation largely through the efforts and labors of the respondent, in which he was greatly assisted and aided by a certain committee, composed of citizens of Pierce county, who had theretofore been appointed and selected as an advisory committee by the commanding officer at Camp Lewis, of which committee the appellant Appleby was chairman; that on June 11, 1918, the privilege held by the corporation was of large value; although subject to cancellation at any time by the commanding officer of the army post or by any higher military authority; that its business consisted of locating and granting concessions to persons desirous of establishing them in such park, and in supervising the construction, operation and conduct thereof, and of putting in and constructing permanent utilities therein; that, previous to June 11, 1918, the corporation had expended, or caused to be expended, in the construction of permanent utilities in such park, and in the laying out of its streets and alleys, and in its gas, water and sewer systems, a large sum of money, approximating one hundred thousand dollars, and had also expended or caused to be expended by concessionaires holding rights in such park additional large sums approximating five hundred thousand dollars; that all of such concessions and improvements were largely secured by the labors and at the instance of the respondent.

It is further alleged that, for several years prior to June 11, 1918, the appellant Appleby was the cashier of the National Bank of Tacoma, at which bank the respondent had for several years done a general banking business; that, in the course of such business, he had become acquainted and friendly with the appellant,

and had frequently sought his advice and counsel regarding business matters; that, by reason of his friendship for Appleby and of Appleby's apparent friendship for him, he had, on June 11, 1918, the utmost faith and confidence in Appleby, and in his honesty, truth and probity; that he also had confidence in the truthfulness and integrity of the appellant Kelly; that, on and prior to June 11, 1918, the appellants, Appleby, Kelly, Neely and Smyly, confederated and conspired together for the purpose of obtaining from him four hundred shares of the capital stock of the Camp Lewis Amusement Company, and for the purpose of injuring and defrauding him out of such stock, and for the purpose of securing the stock for themselves; that on June 11, 1918, in pursuance of the conspiracy aforesaid and for the purposes aforesaid, the appellants Appleby and Kelly wilfully and falsely represented and stated to him that the commanding officer at Camp Lewis had threatened, and was threatening, to cancel the privileges held by The Camp Lewis Amusement Company, and had also stated that he was greatly dissatisfied with the respondent and with the way in which he was handling the business of the corporation—that he, the commanding general, was tired of the complaints of the concessionaires, and that he would cancel the privileges granted to the corporation unless there was a change in the management of the corporation, and unless the respondent would transfer to Appleby and Kelly two hundred shares each of the capital stock of the corporation so that they could become actively identified with the management thereof; that the respondent, by reason of his implicit faith and confidence in Appleby and Kelly, and believing to be true the representations so made, turned over and delivered to Appleby four hundred shares of the corporation stock. That the representations so made

were false and untrue, and were made by the appellants and each of them and known to be so by Appleby and Kelly when so made, and that they were made for the purpose of cheating and defrauding him out of the stock; that the stock is and on June 11, 1918, was of the reasonable market value of more than forty thousand dollars, and that he had demanded the return thereof from the appellants, which demand had been refused.

It was further alleged that, at all times prior to June 11, 1918, the respondent was treasurer and vice-president of the corporation, in the active management thereof, and was receiving a salary of $350 per month; that, as soon as the appellants Appleby and Kelly got possession of the stock, all of the defendants met and removed the respondent from his official connection with the corporation, and assumed the management of the corporation themselves; that, since assuming such management, the appellants have grossly mismanaged the affairs of the corporation; that, because thereof, many of the concessions theretofore granted have not been fulfilled, and the commanding officer of Camp Lewis has notified the company to perform work which has not been performed, and that there is danger that the concession granted the corporation may be cancelled; that all of said work would have been performed had he not been defrauded of his stocks and removed from the active management of the company; and that, by reason thereof, his remaining stock has greatly decreased in value and in earnings and dividends, all to his loss in the sum of ten thousand dollars. The prayer of the complaint is (1) for the return of the shares of stock, or in case they cannot be returned, judgment for their value in the sum of forty thousand dollars; (2) for judgment in the sum of ten thousand dollars for damages and injuries sustained by the de-

tention of the stock; and (3) for the costs and expenses in the action to be incurred.

The appellants Smyly and Neely answered the complaint jointly, and the appellants Appleby and Kelly answered separately. Their answers were, in substance, the same, and were in effect a general denial of the traversable allegations of the complaint. No special affirmative defense was interposed by Neely, Smyly, or Appleby. Kelly set up affirmatively, by way of a separate answer, that, of the six hundred shares of stock issued to respondent on the formation of the corporation, two hundred shares thereof were held in trust by the respondent for him, and that, by the terms of the trust, he was entitled to receive from the respondent, at any time on demand, a transfer to him of the stock. A reply was filed to the affirmative answer of Kelly denying each and every allegation therein contained.

The action was tried by the court sitting with a jury. The jury found "for the plaintiff and against the defendants Stephen Appleby, Elliott Kelly, P. W. Smyly and H. J. Neely, that the plaintiff is the owner of and entitled to the return of the four hundred shares of stock in controversy;" further finding the value of the stock to be $33,000.

The shares of stock were introduced as evidence during the course of the trial. Later on, a question arose as to the form of verdict the jury should return, the question being whether the jury should make a finding as to the value of the stock. The court finding, on inquiry, that all of the stock was in court, ordered the same to be "impounded and held subject to the finding of the jury;" ruling that no finding of value need be made. Later on, however, the court changed its ruling in this regard, and submitted the question of value to the jury.

On the verdict, and after motions for judgment notwithstanding the verdict and motions for a new trial, interposed on behalf of the several appellants, had been overruled, the court entered the following judgment (formal parts and recitals omitted):

"It Is Now Therefore in Accordance With Said Verdict, and in Consideration of the Premises, Ordered, Adjudged and Decreed, that plaintiff is, and at all times has been the owner of, and is entitled to have returned and restored to him the certificates, or shares óf stock described and referred to in the complaint, to wit:

"Certificates No. 13, 11 and 12, for 100 shares.
"Certificate No. 4,            for 100 shares.
"Certificate No. 6,            for 100 shares.
"Certificate No. 3,            for 100 shares.

"It Is Further Ordered, Adjudged and Decreed that said shares of stock were, on the 11th day of June, 1918, of the value of thirty-three thousand dollars.

"It Is Further Ordered, Adjudged and Decreed that, within ten (10) days from the date hereof, the clerk of this court return and deliver said shares of stock to plaintiff, and in the event that it is impossible so to do, that thereupon judgment will, on application, be entered in favor of plaintiff,.and against defendants, and each of them, in the sum of thirty-three thousand dollars, the value of said shares of stock, together with interest from the 11th day of June, 1919, together with the costs of this action."

This appeal is from the judgment so entered.

The respondent moves to dismiss the appeal, basing the motion upon the ground that the controversy has ceased. The motion has for its foundation the affidavit of the clerk of the court in which the judgment was entered, to the effect that one of the attorneys for the defendants, within a short time after the judgment was entered, instructed him to tender and deliver the shares of stock then in his possession to the plaintiff in the action. He further affirms that some days later,

one of the plaintiff's attorneys appeared at his office
for the stock and requested its delivery; that, before
delivering it to him, he communicated with the at-
torney first named, mentioning the fact that posses-
sion of the stock had been requested by the plaintiff's
attorney, and inquired what action should be taken in
the matter; that the attorney answered to the effect
that he had no suggestions to make, and that he there-
upon delivered the stock to the attorney requesting it,
taking his receipt for the same. The attorney for the
defendants referred to by the clerk relates the conver-
sation somewhat differently. His version is that,
shortly after the time of the rendition of the judgment,
he was at the court house looking over the record pre-
paratory to taking an appeal; that, at such time, the
clerk inquired of him concerning his (the clerk's)
duties with reference to the stock under the terms of
the judgment, and that he informed the clerk that it
was his duty to obey the behest of the judgment and
tender the shares of stock to the plaintiff. He states,
however, that he did not direct the clerk to deliver
over the stock and did not tell him that it was not his
purpose to appeal; that, on the contrary, he did tell
the clerk that he intended to take an appeal, although
it was not his purpose to give the supersedeas bond
necessary to effect a stay of execution pending the ap-
peal. His version of the second conversation does not
differ materially from that given by the clerk. The
attorney further disclaims any intention of making
a voluntary surrender of the stock on behalf of his
clients, or of waiving their right of appeal, and avers
that he had no authority from his clients so to do. The
record shows that the attorney immediately thereafter
gave notice of appeal, filed the necessary cost bond,
and with due diligence perfected the appeal in this
court. A copy of the receipt given by the plaintiff's

attorneys on the surrender of the stock to them by the clerk is also in the record. It is significant that this does not recite that it was delivered pursuant to consent given by the defendants or their attorneys. The actual recital being that it was "delivered and received in accordance with the terms of said judgment."

We cannot conclude that the foregoing shows a cessation of the controversy. If we were to take the clerk's version of the conversations at its face value, nothing more is shown when the subsequent proceedings are considered than that the defendants at one time concluded not to appeal, and afterwards reached a different conclusion. Manifestly this does not amount to a cessation of the controversy. The right of appeal must rest upon the acts of the parties appellant, not upon their mental operations between the time of the judgment and the time the appeal is definitely determined upon. It may be that, had the clerk correctly gathered the purport of counsel's advice, had communicated it to the plaintiff, and the plaintiff had acted thereon to his injury, this court would not entertain the appeal until the injury had been corrected, or the plaintiff been placed in *statu quo;* but there is nothing in the record to show this act of the attorney in any manner operated to the plaintiff's injury, or that his interests were in any manner thereby affected.

To our minds, however, there is not even the foundation indicated upon which to base the motion. As we read the affidavits, there was nothing more than a misunderstanding on the part of the clerk of the purport of the conversation between himself and the attorney, a misunderstanding not material, and by which the rights of no one were adversely affected. This under no circumstances could justify the dismissal of an appeal.

On the merits of the controversy, the assignments of error relate chiefly, as we have before indicated, to the admission of evidence. These assignments are many, and even then do not include much of the evidence that to our minds was properly subject to objection. The issues were comparatively simple, involving only the questions whether there was a conspiracy on the part of the appellants to deprive the respondent of his stock in the corporation named, whether as a result of that conspiracy he was wrongfully and fraudulently deprived of it, and if he was so wrongfully deprived of it, what was its value; yet the court permitted the respondent in his case in chief to go into the entire relations of the parties, both before and subsequent to the formation of the corporation the capital stock of which is the subject of inquiry. The result was the introduction into the case of numerous contested collateral issues, having no bearing upon the principal questions, and which could not have been otherwise than confusing to the triers of the facts. It resulted, also, in the creation of a massive record, with its consequential burden of cost, which is, and which of right ought to be, the policy of the courts to avoid.

Passing to the specific objections, the appellants first complain of the admission in evidence of a written contract entered into between the appellant Appleby and the Northern Pacific Railway Company, by which Appleby contracted to purchase, and the railway company contracted to sell, certain specifically described tracts of land not connected with the property here involved, and in which the respondent subsequently purchased an interest. In relation thereto, the respondent testified in his case in chief that he had made the purchase, investing therein some four thousand dollars and had not received from Appleby any writing showing his interests, or even a receipt for the money

paid. Because of this statement of the respondent the appellants felt compelled to show the real nature of the transaction. It was made to appear that Appleby had made the contract of purchase as an investment on behalf of himself and others; that the respondent, in purchasing an interest therein, did not deal with Appleby or even consult with him, but dealt with an agent of the parties interested, and had received from the agent a statement signed by one of the parties in interest showing not only the nature of the contract between Appleby and the railway company and the interest therein acquired by the respondent by his purchase, but a receipt for the money paid. The ostensible purpose of the evidence was, of course, to show the existence of a relation of trust and confidence between Appleby and the respondent, making the respondent more susceptible to the representations of Appleby than he would have been had they theretofore been strangers. But had the respondent's statements been true in substance, as they were probably true literally, the evidence was beside the point. The question was not whether the respondent had confidence in the fidelity and integrity of Appleby, but whether the conduct of Appleby had been such as to inspire the respondent as a reasonably prudent person with such confidence. On this issue, the contract, even with the accompanying oral evidence, proved nothing. It in no way tended to show that Appleby's conduct in connection therewith had been such as to inspire the respondent with trust and confidence in his integrity, and moreover, it introduced a collateral issue unenlightening as to any issue the jury were required to determine.

The second and third assignments are based on evidence concerning a tentative plan which the respondent Proctor and the appellants Neely and Smyly had

under consideration, for financing the concession, should it be granted them. It appears that, when the commanding general of the Camp Lewis army post concluded to establish, in connection therewith, an amusement zone for the entertainment of soldiers stationed at the camp, he selected a committee of citizens of Pierce county to confer and advise with him as to the character of the amusements and business that should be conducted therein, and as to the best manner of financing the undertaking. This committee had under consideration the scheme of granting a concession to some person who would, at his own cost, prepare the grounds, supply them with the necessary sewage system, water supply, and lights, and erect the structures for the installation of the amusement features contemplated. This scheme failed of fruition, and later on an entirely different one was adopted. While the scheme was under advisement, the subsequent grantees of the concession, Proctor, Neely and Smyly, learned of the plan and attempted to prepare themselves to meet the conditions that would be imposed upon them should the plan be adopted and they be granted the franchise. At the trial, the court, over the objections of the appellants, permitted evidence of such attempts to go to the jury. This, we are clear, was a manifest error. It threw no light upon the real issues, and its only tendency was to confuse the minds of the jury concerning such issues.

The advisory committee before mentioned held a number of meetings of which minutes were kept and recorded. These were somewhat elaborate, reciting not only the conclusions of the committee but much of the discussion between the different members concerning the matters which the committee had under advisement. They contain, also, recitals of applications for the main concession from parties other than

the person to whom it was finally granted, applications for minor concessions, protests of certain merchants of Tacoma against the granting of concessions for the sale of particular articles, and matters of similar import. These minutes were offered and admitted as a whole. The respondent's counsel, arguing for their admissibility, contends that they bear upon the question of ownership of the stock of the corporation, and particular parts of them are pointed out as supporting the contention. But if the contention were conceded, plainly only the parts bearing on the question should have been admitted. It was unnecessary to encumber the record with minutes as a mass the greater part of which was, even under the respondent's claims, entirely foreign to the issues. We cannot, however, agree with the contention as made. It is argued, first, that the minutes show the authorization by the committee of a newspaper interview, that this interview as prepared and published contained a recital that no member of the committee would have an interest in the concession granted, and that this amounted to a declaration against interest on the part of the appellants Appleby and Kelly, who were members of the committee.

It is elementary, of course, that the declarations of a party to the record, or the declarations of one in interest with him, are, as against such party, admissible as evidence; and it is elementary, also, that the acts and conduct of a party when inconsistent with his present claims, may be shown against him; but we find nothing in these minutes that justify their admission on either of the grounds stated. The only reference to a newspaper interview is found in the minutes of the first meeting of the committee, at the time of its organization, before the granting of a concession and before any scheme or plan for the furtherance of the objects for which the committee were appointed

was proposed or discussed, and then only a recital to the effect that the secretary "was instructed to prepare an interview for the newspapers." Plainly, this is not an admission, or declaration, either by words, acts, or conduct against interest on the part of the appellants to whom it was directed. The further contention is that they show a statement by a member of the committee, "that it was represented that the only parties interested were Neely, Proctor and Smyly, copartners in the concession, acquiesced in by Proctor, Neely, Smyly and Appleby, all present at the meeting." It is a sufficient answer to this to say that no part of the minutes are pointed out to us where such a representation was made under the conditions recited, and that we have found none.

Assignments five to nine relate to testimony on the part of the respondent as to the amount of work he performed and the amount of work performed by his copartners in interest, after the concession was granted, in the promotion of its purposes; the amount of money the respondent expended from the time he began his endeavors to secure the concession and the time he was induced to part with his stock and the amount of money he had withdrawn from the corporation; the time he had devoted to the affairs of the corporation as compared with the time devoted by the other owners of its stock; and the financial condition of the appellant Smyly, and the fact that the respondent had loaned him money which had not been repaid. This requires no comment. It in no way tended to elucidate the real issues between the parties.

After the respondent had made the assignment of the shares of stock in question to Appleby and Kelly, he became suspicious, as he testifies, that the truth had not been told him, and attempted to interview per-

sonally the commanding general of the army post. He was unable to reach him, being refused admission by the general's aids. He was permitted not only to testify to the fact itself, but to the conversations between himself and the aids. Under assignment ten, the appellants contend, we think justly, that these conversations were inadmissible. If the evidence was not in its nature hearsay, it was nothing in which the appellants had a part, and thus was not evidence against them. It was also prejudicial. The respondent was thus enabled to get before the jury a number of self-serving declarations; some of them carrying the inference that the commanding general had a part in the claimed conspiracy by which he was induced to part with the stock.

Assignments twelve and thirteen relate to the introduction in evidence of a newspaper interview prepared by the secretary of the advisory committee before mentioned. The articles, among other things, stated that, "no person on the executive committee will have any financial interest, direct or indirect in the venture," the venture being the establishment of the amusement zone for the soldiers stationed at Camp Lewis. The article was apparently admitted on the theory that it was an admission or declaration against interest on the part of Appleby and Kelly. But it did not appear that either of the appellants had a part in the preparation of the article, or were consulted with reference thereto; nor did it appear that they had knowledge of its contents prior to its publication. Nor does it appear that either of them at that time had or contemplated having any interest in the enterprise. The respondent of course testifies that they at no time had an interest. Neely and Smyly testify that, after the concession was granted and after the corporation was formed and the concession assigned to it, which was

after the publication of the article, they, together with
the respondent, agreed without the knowledge of
either Appleby or Kelly to reserve two-fifths of the
capital stock of the corporation to be later assigned in
equal amounts to them as a gift, and that the respond-
ent took the shares in trust for that purpose. Under
these circumstances, it could hardly be said that state-
ments in the publication amounted to a declaration
against interest on the part of Appleby or Kelly.

The subject of assignments fourteen to seventeen is
the admission of testimony from certain members of
the advisory committee to the effect that neither Kelly
nor Appleby had ever made known to them that they
had or expected to have an interest in the concession
proposed to be granted. This evidence, if we have cor-
rectly gathered its purport, was admitted for the pur-
pose of showing a disclaimer on the part of Kelly and
Appleby of any interest in the stock. It is the rule,
no doubt, that, when a person is silent concerning a
fact under circumstances which make it his duty to
speak, and another, in ignorance of the fact, acts
thereon in a manner he would not have done but for
such silence, the first party will not thereafter be
heard to assert the fact to the other party's injury.
But to make silence operate as an estoppel or as a
disclaimer of interest, the circumstances must have
been such as to make it a legal duty to speak. In this
instance, assuming that the record shows that the ap-
pellants named would have an interest or purposed
acquiring an interest in the concession proposed to be
granted, they owed no legal duty to declare the fact
to their fellow members of the committee. Their
failure so to do is not, therefore, competent evidence
of a want of interest or as a disclaimer of interest.

Assignments eighteen to twenty relate to the ad-
mission in evidence of certain instruments relating to

the establishment of the army post known as Camp Lewis. These included the resolution of the county commissioners of Pierce county initiating the proceedings by which the land was acquired on which the post is situated, certain letters written to the Secretary of War in relation thereto and the replies of the Secretary. These were admitted on the theory that they tended to show the permanency of the army post. The fact of the permanency of the post was competent to be shown, since it affected the value of the concession and hence the value of the stock of the corporation holding it. It would seem, however, that the fact, since it was only indirectly in issue, might have been shown without the resort to these voluminous documents, with their mass of irrelevant matter. Titles to real property, where the question of title is only inadvertently or collaterally involved, may be established by parol evidence from one qualified to speak (*Littlefield v. Bowen*, 90 Wash. 286, 155 Pac. 1053, Ann. Cas. 1918 B 177; *Shanks v. Robertson*, 1 A. L. R. 1140 and note); and, by an analogous principle, the fact here sought to be established could be shown in a similar manner.

The court permitted evidence of the number of minor concessions installed in the zone subsequent to the time the respondent was ousted as an officer of the corporation; this, on the principle that it tended to show the comparative amount of work performed for the benefit of the corporation by the respondent and by its other officers. Since it was the duty of the several officers of the corporation to give their best endeavors to its management, it was immaterial to any issue presented by the pleadings whether one of them performed more work to that end than another. But the evidence was objectionable in other respects. It permitted of a comparison wholly misleading as to

the other officers. The granting of concessions was
the part of the work taken by the respondent at his
own suggestion at the time of the formation of the
corporation. Concessions were then eagerly sought
after. There could be but a limited number granted,
and naturally the major portion and those most de-
sirable would be granted in the early history of the
corporation. To permit the respondent to show that
he had, during his incumbency, granted more conces-
sions than had the other officers during their incum-
bency, would have no tendency to show that he had
been more diligent than had been the other officers.

It may be that this, and many other of the several
matters we have said to be inadmissible as evidence,
would not be prejudicial if standing alone. Its accu-
mulated mass, however, we think the record shows
was clearly so. There was no direct evidence tending
to show a conspiracy on the part of the appellants to
deprive the respondent of his stock, and the indirect
evidence connecting the appellants Neely and Smyly
therewith, if one existed on the part of the other ap-
pellants, was extremely remote. There was but little
evidence supporting the finding of value made by the
jury concerning the stock. It rested entirely upon the
statements of the respondent, and these were so quali-
fied as to entitle them seemingly to but little credence.
Again, it was the respondent's claim throughout the
evidence that he was the procuring cause of the grant
of the concession, that his connection with it was its
sole element of value, and that the interests of the
others therein existed solely by his grace. That these
statements may not appear as exaggerations, a few
short extracts from the record is permissible. In the
testimony of the respondent concerning the interest
of Neely in the concession, the following appears (the
questions are by his own counsel) :

"Q. What, if anything, did you say to Mr. Smyly as to the change of the plan in the way in which the thing could be handled without the necessity of raising the large sum of money? A. I explained the plan to him in detail. Q. As you have explained it to the jury? A. As I have explained it to the jury. Q. Did you have any conversation with him about the interest which Mr. Neely was to have in the proposition after Neely had failed to raise the sum of money? A. Yes, sir. Q. What was that conversation? A. He asked me, as near as I can remember, possibly on the Friday or the Monday the concession was awarded to us, what disposition I was going to make with Neely, and I said, 'Smyly, Neely has probably done his best. I have been a salesman myself and I know how hard it is sometimes to raise money; and I think, while he made a misrepresentation to me, I believe, when he told me he was worth four hundred thousand dollars, nevertheless, I think he is an older man, a man with a lot of experience; I think he has good judgment; I think we can use him, and let's give him the same amount promised to him originally, namely, one-fifth interest, and let's take him in.' "

This will be better understood when it is remembered that Neely was the sole grantee of the concession; that neither the witness nor Smyly were named or referred to therein; and that Neely at this time had the grant in his possession.

Testifying in his direct examination to the value of the stock of which he was deprived, he stated that it had a value "of sixty-five or seventy thousand dollars." On cross-examination, his attention was called to a suit he had instituted seeking the appointment of a receiver for the corporation, begun after he had parted with the stock, in which he verified a complaint stating that the corporation had assets of no greater value than $2,500, and had outstanding debts and liabilities approximating $11,000, and was insolvent. He explained by saying:

"These statements are true as far as Mr. Neely and Smyly being manager of this company. This stock in my estimation is positively worthless as long as they are managers. I could have sold this stock very easily with my being manager for sixty-five to seventy thousand dollars, . . . very, very easily with my management in connection with the proposition. . . . I mean to honestly and truthfully tell the jury that, under my management out there, I could make that stock worth every cent of that, and it could be sold for sixty-five or seventy thousand dollars at the time I was removed; and I mean to tell the jury the stock was not worth twenty-five hundred dollars with Neely and Smyly as managers."

The verdict of the jury indicates that they took the respondent's valuation of his powers at its full face value. It hardly seems that they would have done so had the evidence been confined to the legitimate issues.

The remaining assignments require no special consideration. On a new trial, which must be awarded, they will not recur in the form now presented, and any discussion of them would be without purpose.

The judgment is reversed, and the cause remanded with instruction to grant a new trial.

HOLCOMB, C. J., TOLMAN, BRIDGES, and MOUNT, JJ., concur.